UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:   Twin Pines. LLC,

Debtor.                                                    No. 19-10295-j11

## MEMORANDUM OPINION ON DEBTOR'S
## MOTION FOR VALUATION OF COLLATERAL

BEFORE the Court is Debtor's Motion to Determine Value of Collateral (the "Valuation Motion") (Doc. 142). The Court held a final hearing on the Valuation Motion on October 13, 2020, November 18, 2020, and November 19, 2020 and took the matter under advisement. The parties and counsel who appeared at the hearing are noted in the record.

In the Valuation Motion, Debtor asks the Court to value certain real property collateral pledged to First Alamogordo Bancorp of Nevada, Inc., d/b/a First National Bank ("FNB") under two mortgages. In the Valuation Motion, Debtor calls the collateral to be valued the "Properties" and defines "Properties" as two specific tracts – Maudie West Tract 1 and Maudie West Tract 2 – located in Ruidoso, New Mexico. The Valuation Motion does not ask the Court to value any personal or intangible property or to determine the amount of FNB's allowed secured claim in this bankruptcy case. At the final hearing on the Valuation Motion the parties presented evidence on the value of not only the two tracts of land described in the Valuation Motion but also on the value of the improvements to the real property and the equipment used in Debtor's business operations. To conform the Valuation Motion to the evidence and the issues actually litigated by the parties, the Court deems the Valuation Motion amended to seek a valuation of all real property,

improvements, and equipment that serves as collateral for FNB's claims. The value of FNB's other collateral is not before the Court at this time.[1]

At the final hearing, the Court heard testimony by an appraiser hired by Debtor, Marc Beatty, and an appraiser hired by FNB, Clint Bumguardner. The Court admitted the appraisal reports by Beatty and Bumguardner into evidence. John Pacheco, Debtor's managing member, and Debra Romero, FNB's representative, also testified.

The Court has found that the aggregate value of the real property, improvements, and equipment at issue in which FNB has a lien is $900,000 minus the amount of any prior liens against the property pledged to FNB.

## PROCEDURAL HISTORY

Debtor commenced this chapter 11 case on February 12, 2019 (the "Petition Date") under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq*.[2] A little over a year after the Petition Date, Debtor amended its voluntary petition to elect treatment under the then newly effective provisions of subchapter V. *See* Doc. 96. On April 30, 2020, the Court authorized Debtor to proceed under subchapter V over FNB's objection and denied FNB's motion to dismiss Debtor's bankruptcy case. *See* Docs. 123 and 124.

Debtor filed a Plan of Reorganization, dated October 21, 2019. Doc. 60. Subsequently, on June 16, 2020, Debtor filed an Amended Plan of Reorganization under Subchapter V ("Amended

---

[1] FNB's other collateral includes cash equivalents owned by Debtor when it commenced its chapter 11 case and post-petition net rents. As adequate protection, the Court granted FNB a lien against equipment Debtor acquired post-petition to the extent of any post-petition diminution in the value of FNB's cash collateral and has required Debtor to make adequate protection payments to FNB as a condition to use of cash collateral. The following issues are not before the Court: (a) the amount of cash collateral against which FNB holds a lien, (b) the extent of any post-petition diminution in the value of FNB's cash collateral, (c) the value of FNB's interest in after-acquired equipment predicated on liens granted in cash collateral orders; and (d) the amount of the credit to be given to Debtor as a result of adequate protection payments.

[2] All future references to "Code," "Section," and "§" are to the Bankruptcy Code, Title 11 of the United States Code, unless otherwise indicated.

Plan"). Doc. 136. In its Amended Plan, Debtor seeks to reduce the amount of FNB's allowed secured claim to the value of its interest in Debtor's property, to wit, the value of Debtor's real property, equipment, and general intangibles less the amount of a prior tax lien against the property. In the Valuation Motion, Debtor alleges the value of the real property, improvements, and equipment securing FNB's claim is $650,000. Debtor filed the Valuation Motion as part of its effort to move toward confirmation.

The Court has granted Debtor authority to use cash collateral six times, including during an initial interim period. *See* Docs. 25, 50, 121, 125 (supplementing third interim order), 148, 194, and 222. Under the cash collateral orders, Debtor was ordered to make monthly adequate protection payments of $2,000 to FNB. In addition, the Court granted FNB a lien against property of the same type as the collateral acquired by Debtor post-petition (including after-acquired equipment) to the extent of any reduction or diminution in the value of FNB's cash collateral from and after the Petition Date. Doc. 222.

On January 19, 2021, the Court granted Debtor's motion for authorization to use cash collateral through March 31, 2021. Doc. 234. The Court ordered Debtor to increase its monthly adequate protection payments to FNB to $2,500. In addition, as adequate protection for any decline in the value of FNB's cash collateral, the Court granted FNB a lien against post-petition cash and against property of the same type as the pre-petition collateral acquired by Debtor post-petition (including equipment) to the extent of any diminution in the value of FNB's cash collateral from January 20, 2021 through March 31, 2021. That lien secures the amount of post-petition Net Rents the Debtor has collected or collects from the Petition Date until the end of the March 31, 2021 in excess of the aggregate amount of adequate protection payments Debtor makes to FNB during that period.

**FINDINGS OF FACT**[3]

**I.      Twin Pines, LLC, and its Assets**

Debtor is a limited-liability company. John Pacheco ("Mr. Pacheco") is Debtor's managing

member. Mr. Pacheco, Jason Edmister ("Mr. Edmister"), and John Pacheco, Jr. ("Mr. J. Pacheco")

own membership interests in Debtor of 40%, 20%, and 20%, respectively.

Debtor owns and operates a car wash in Ruidoso, New Mexico doing business as Ruidoso

Laserwash ("Ruidoso Laserwash" or the "Car Wash").[4] Ruidoso Laserwash has been in operation

since 2006 or 2007. Ruidoso Laserwash's business is seasonal, with higher sales in the summer

and winter driven by town's seasonal tourist traffic. Debtor's car wash facility has two bays, one

located on the northern portion of the property and one located on the southern portion of the

property. Until recently, each bay had a Laser Wash 4000 car wash system. The Laser Wash 4000

systems were installed in the bays around 1999 and were expected to function for approximately

500,000 car washes, or 10-15 years. Because the wash system in the northern bay had reached the

end of its useful life and had not been operable since early 2017, Debtor started using the northern

bay for manual vehicle detailing. After the northern bay Laser Wash system stopped operating,

Debtor operated with only one drive-through car wash system in the southern bay. The two

appraisers testifying at the hearing on the Valuation Motion estimated a 75% or 80% decline in

value of Debtor's two Laser 4000 car wash systems based on age compared with useful life as of

---

[3] The Court enters its findings of fact and conclusions of law in this Memorandum Opinion in accordance with Fed. R. Bankr. P. 9014 and Fed. R. Bankr. P. 7052. To the extent the Facts section of this Memorandum Opinion includes conclusions of law, such conclusions are incorporated by reference into the Discussion, and to the extent the Discussion section contains findings of fact, such findings are incorporated by reference into the Facts section. To avoid repetition, the Court intentionally made findings of fact relating to the two appraisals in the Discussion section instead of making the findings in the Facts section and then repeating them in its discussion of the appraisals.

[4] The term "Car Wash" as used in this Memorandum Opinion excludes a two-bedroom house located on the same tract as the Car Wash even though the house has been used by the manager of the Car Wash. Because Debtor now rents the house to tenants the Court is valuing the house as a rental property.

-4-

Summer 2020. From January 2018 through February 2019, Mr. Pacheco was not able to personally maintain or operate the car wash equipment or the other assets because he was incarcerated.

Since the Petition Date, as the Laser Wash 4000 system in the southern bay neared the end of its useful life, it became more and more difficult for Debtor to keep it operational. Debtor shut down the Car Wash in March 2020 to comply with state-mandated COVID-19 restrictions. When Debtor was permitted to reopen the Car Wash in August 2020, it could not get the Laser Wash 4000 system in the southern bay to work.

In June 2020, Debtor purchased a Laser Wash 360 Plus system and related equipment for the southern bay (collectively, the "After-Acquired Equipment") from Sun Country Car Wash Systems ("Sun Country"). The members of Debtor reached an oral agreement with Ruidoso Capital Resources, LLC ("Ruidoso Capital") in June 2020 under which Debtor's members will transfer membership interests in Debtor to Ruidoso Capital so that upon confirmation of a plan in this case Mr. Pacheco, Mr. Edmister, and Ruidoso Capital will own membership interests in Debtor of 34%, 33% and 33%, respectively. Ruidoso Capital invested in Debtor by paying a portion of the purchase price for the After-Acquired Equipment in exchange for Ruidoso Capital's 33% membership interest.[5]

The After-Acquired Equipment was delivered to Debtor in September 2020 and installed in the southern bay the next month. The Laser Wash 360 Plus system is a much more modern system with a number of advantages over the Laser Wash 4000 system, including the capacity to wash more vehicles per day due to a faster wash speed. In addition, the Laser Wash 360 Plus system was installed in the southern bay, which accommodates large vehicles. The manufacturer has discontinued the Laser Wash 4000.

---

[5] International Protection, Inc. paid for the equipment. Such payment constituted a loan from International Protection, Inc. to Ruidoso Capital.

Sun Country issued a quote to Debtor on June 16, 2020 for the new Laser Wash 360 Plus system and associated equipment in the amount of $197,855. That price took into account that Debtor would use certain operable components from its two Laser Wash 4000 systems in the Laser Wash 360 Plus system. The reusable equipment includes the water treatment system, reverse osmosis system, some wall mount equipment, and some components of the wash activation system. Mr. Pacheco's company, Silverline Construction and Rehab, completed the electrical and plumbing work necessary to install the Laser Wash 360 Plus system at no charge to Debtor. With a few other adjustments, Debtor reduced its cost of the Laser Wash 360 Plus system and accessories further to $155,927. In addition to the Laser Wash 360 Plus system and associated equipment, Car Wash assets include water storage tanks, pressure pumps, water softener/reverse osmosis system, towel vending, and air-dry blowers.

As of a cash collateral hearing on December 18, 2020, Debtor was continuing to test its new Laser Wash 360 Plus system before opening it to the public generally. At that time, the Laser Wash 360 Plus system in the southern bay was at 80% capacity, meaning that it could perform touchless car washes, but it did not yet have all the features Debtor intends to add to the system.

Debtor also owns and leases four condominium units (the "Duplexes") and a two-bedroom single-family home (the "Manager's Quarters") on real property adjacent to the Car Wash (collectively, the "Rental Units"). The Rental Units presently are rented, and the current tenants have agreed to extend their leases at least through August 2021. Debtor uses revenue from the Car Wash and Rental Units to finance its operations. There is also a storage building near the Duplexes that Debtor has recently rented as a coffee kiosk (the "Kiosk").

The Car Wash, Manager's Quarters, Rental Units, and Kiosk are located on two parcels of real property (the "Real Property"):

-6-

A. MAUDIE WEST TRACT 1, Ruidoso, Lincoln County, New Mexico, as shown by the Replat of Maudie West (Kelly) Tract (As Replatted), filed in the office of the County Clerk of Lincoln County, New Mexico, September 24, 2003, in Cabinet H, slide No. 681, and further shown by ALTA/ACSM Land Title Survey filed March 8, 2006, in Cabinet I, Slide No. 476.

B. MAUDIE WEST TRACT 2, Ruidoso, Lincoln County, New Mexico, as shown by the Replat of the Maudie West (Kelly) Tract (As Replatted), filed in the office of the County Clerk of Lincoln County, New Mexico, September 24, 2003, in Cabinet H, Slide No. 681 and further show by ALTA/ACSM Land Title Survey filed March 8, 2006, in Cabinet I, Slide No. 476.

Tract 1, which includes the Car Wash and Manager's Quarters, is located at 705 Mechem Drive. Tract 2, on which the Duplexes and Kiosk are situated, is located at 701 Mechem Drive in Ruidoso.

The highest and best use of the Car Wash is to operate it with one fully functioning Laser 360 Plus automatic car wash bay and to use the other bay for other purposes, such as auto detailing. This finding is supported by (a) comparing the gross income from the operation of the Car Wash in years with two fully functional automatic car wash bays with gross income from years in which only one automatic car wash bay was functioning, (b) taking into account the cost of purchasing and installing a new Laser Wash 360 Plus car wash system in one of Debtor's bays, and (c) the Laser Wash 360 Plus system's higher throughput capacity than the system it replaced (it can wash more cars per day) and its capability to wash large vehicles.

## II.    First National Bank Financing

Debtor purchased the Car Wash and Manager's Quarters, as well as Tract 2 and the Kiosk, with financing of $525,000, then refinanced the original borrowing in 2016, with FNB as lender. As part of the refinancing, Debtor also borrowed additional funds from FNB for construction of the Rental Units. The refinancing and additional advanced funds resulted in a loan FNB to Debtor in the principal amount of $995,000 (the "2016 Loan"). The 2016 Loan is secured by Debtor's real

property, equipment, and general intangibles, as well as an assignment of rents. In addition to other liens, Debtor granted FNB a lien against fixtures in a mortgage and a security interest in fixtures in a security agreement. The liens were perfected.

In October 2016, Mr. Pacheco and Mr. Edmister borrowed $58,000 from FNB (the "Pacheco/Edmister Loan"). Debtor guaranteed the Pacheco/Edmister Loan and granted FNB a third mortgage on Tract 1 as collateral for the loan. Mr. Pacheco, Andrea Pacheco (Mr. Pacheco's wife), Michael Bowen (a previous member of Debtor), and Mr. Edmister have guaranteed one or more of Debtor's obligations to FNB.

FNB filed a proof of claim in the amount of $1,059,206.66 related to the 2016 Loan (Claim 3-1) and a proof of claim in the amount of $48,008.71 related to the Pacheco/Edmister Loan (Claim 4-1). FNB claims a total amount of $1,107,215.37 as of the Petition Date. In its proofs of claim, FNB lists the collateral for the two loans as having a value of $1,365,000.

In its schedules, Debtor estimated the value of the collateral securing FNB's loans as $1,265,527.34. However, in Debtor's Amended Disclosure Statement, Debtor estimated the value of FNB's interest in the collateral as $650,000.

## III.     Other Liens against Debtor's Property

Debtor's Amended Plan provides for an allowed secured claim of the Lincoln County Treasurer in the amount of $18,374.90 plus interest and states that the Lincoln County Treasurer's lien is superior to FNB's interest.

## IV.     The Appraisers

The parties called two certified appraisers, Marc Beatty and Clint Bumguardner (collectively, the "Appraisers"), as expert witnesses. Debtor called Beatty as its expert witness. He is a designated member of the Appraisal Institute and a certified appraiser in the State of New Mexico. He has been an appraiser in Ruidoso since 2006 and serves on the board of directors of

-8-

the Rio Grande chapter of the Appraisal Institute. In his engagement letter to Debtor, Beatty stated that his work conforms to "the Interagency Appraisal and Evaluation Guidelines, the Uniform Standards of Professional Appraisal Practice [("USPAP")] . . . and the Appraisal Institute's Code of Professional Ethics and Standards of Professional Appraisal Practice."

FNB called Bumguardner as its expert witness. He is a member of the Appraisal Institute and a certified appraiser in the State of New Mexico and 12 other states. He has been an appraiser since 1988. He holds a Master of Agriculture in Land Economics and Real Estate degree from Texas A & M University. He served as the President of the Texas Plains Chapter of the Appraisal Institute from 2006-07. Bumguardner stated in the appraisal that his report conformed to the Standards of Professional Practice of the Appraisal Institute, the USPAP, and the appraisal standards set forth in 12 Code of Federal Regulations, Part 1608.

## DISCUSSION

### I.  Admission of Expert Testimony

At the final hearing, both parties objected to admission of testimony by the other's appraiser. FNB objected to qualification of Beatty as an expert on the ground that Beatty had not complied with all the requirements for expert reports under Federal Rule of Bankruptcy Procedure 7026(a)(2).[6] The Court found that Beatty had substantially complied with Rule 7026(a)(2) and that FNB was not prejudiced by any failure to strictly comply with the rule and, therefore, overruled the objection. The Court further found that Beatty was qualified to opine on car wash and manufactured house valuations and qualified him as an expert witness.

---

[6] Rule 7026(a)(2) is made applicable to contested matters by Rule 9014.

Debtor objected to qualification of Bumguardner as an expert and admission of Bumguardner's testimony, including his appraisal report, on the ground that the report was "wholly invalidate[d]" by Bumguardner's use of an "extraordinary assumption," defined further below, in place of personal knowledge of the condition of the interior of the Rental Units and the Car Wash. Doc. 197. Debtor argued that because Bumguardner's appraisal rested on the extraordinary assumption that both car wash bays were operational, which both parties agree was false, the appraisal report should not be admitted. The Court overruled the objection and accepted Bumguardner as an expert witness, but limited Bumguardner's testimony to the value of the collateral as though the extraordinary assumption was true. *In re Creekside Sr. Apartments, LP*, 477 B.R. 40, 65 (B.A.P. 6th Cir. 2012) (stating that "[t]he issue of whether an appraiser's report complied with USPAP standards goes to 'the *weight* [the] report should be given, instead of whether it should be admitted.'" *(quoting Whitehouse Hotel Ltd. P'ship v. Comm'r,* 615 F.3d 321, 332 (5th Cir.2010)). The Court also ruled that it would consider opinion evidence as to the appropriate adjustment to that value, required because the extraordinary assumption is false, only from sources other than Bumguardner.

## II. Valuation Standard, Valuation Date, Burden of Proof, Valuation Approaches, and Evaluating Competing Appraisals.

Before discussing the value of Debtor's assets, the Court will address (a) the appropriate valuation standard (e.g., fair market, liquidation, or surrender value); (b) the relevant valuation date; (c) whether Debtor or FNB bears the burden of proof, and (d) how the Court should determine value in the face of competing appraisals.

### A. Valuation Standard

Replacement value is the proper measure of Debtor's assets for purposes of ruling on the Valuation Motion. Under § 506(a)(1), the value of a creditor's collateral "shall be determined in

light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." *See Associates Commercial Corp. v. Rash,* 520 U.S. 953, 962 (1997) (stating that the "'proposed disposition or use' of the collateral is of paramount importance to the valuation question" (quoting § 506(a)). Under § 506(a), the value of property that a debtor chooses to retain in the operation of its business "is the cost the debtor would incur to obtain a like asset for the same 'proposed . . . use,'" known as replacement value. *Rash*, 520 U.S. 953 at 965 (quoting § 506(a));[7] *accord Matter of Houston Reg'l Sports Network, L.P.*, 886 F.3d 523, 529 (5th Cir. 2018); *In re Sunnyslope Hous. Ltd. P'ship*, 859 F.3d 637, 644 (9th Cir. 2017), *as amended* (June 23, 2017*); In re Heritage Highgate, Inc.*, 679 F.3d 132, 141–42 (3d Cir. 2012).[8]

Debtor proposes to retain and use the Car Wash and Rental Units in the operation of its business. In these circumstances, the proper measure of replacement cost is the cost Debtor would incur to buy like assets of equivalent age and condition and in the same locale. Such replacement cost is equivalent to an "as is, where is" fair market value of the assets.

---

[7] In *Rash*, 520 U.S. at 965 n. 6, the United States Supreme Court elaborated:

> Our recognition that the replacement-value standard, not the foreclosure-value standard, governs in cram down cases leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented. Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property. We note, however, that replacement value, in this context, should not include certain items. For example, where the proper measure of the replacement value of a vehicle is its retail value, an adjustment to that value may be necessary: A creditor should not receive portions of the retail price, if any, that reflect the value of items the debtor does not receive when he retains his vehicle, items such as warranties, inventory storage, and reconditioning. Cf. 90 F.3d, at 1051-1052. Nor should the creditor gain from modifications to the property-e.g., the addition of accessories to a vehicle-to which a creditor's lien would not extend under state law.

[8] In *In re Museum of Am. Jewish History*, No. BR 20-11285-MDC, 2020 WL 7786925, at *18 (Bankr. E.D. Pa. Dec. 4, 2020) the Court observed a split in case law regarding whether to value property in accordance with its highest and best use where a debtor intends to use the property for some other purpose. This Court need not address that issue because Debtor intends to use the property pledged to FNB in accordance with its highest and best use.

**B. Valuation Date**

The Court must also determine the relevant valuation date. "Depending on the purpose of the valuation, jurisdictions generally choose from four valuation dates: (1) the date of confirmation; (2) the date of the petition; (3) the date of the valuation hearing; or (4) the effective date of the plan." *In re Hales*, 493 B.R. 861, 864–65 (Bankr. D. Utah 2013). Here, the Court is asked to value FNB's collateral to determine the amount of FNB's allowed secured claim, which will inform the treatment of FNB's claim under a confirmed plan. Therefore, the relevant valuation date is the date of plan confirmation.

A confirmation hearing has not been set in this case. Beatty's appraisal is dated July 10, 2020. Bumguardner's appraisal is dated June 26, 2020. The final hearing on valuation took place on October 13, 2020, November 18, 2020, and November 19, 2020. The Court will determine the value of FNB's collateral as of November 19, 2020.[9] The Court's determination of value will be without prejudice to Debtor or FNB asking the Court, by a motion filed at least forty-five days prior to the date of the confirmation hearing, to adjust the November 19, 2020 valuation to the value as of the date of the confirmation hearing. However, based on the nature of the collateral and the valuation approach the Court has adopted, the Court anticipates there will be no material change in value of the collateral between November 19, 2020 and the date of the confirmation hearing.

**C. Burden of Proof**

Under § 502(a) and Bankruptcy Rule 3001(f), "a properly filed proof of claim is entitled to prima facie validity." *In re Mirada Del Lago, LLC*, No. 11-12-14204 TA, 2013 WL 2318411, at *2 (Bankr. D.N.M. May 28, 2013) (unreported). Debtor therefore bears the initial burden of

---

[9] There are no material changes to the collateral between June 26, 2020 and July 10, 2020 that would affect the value of the collateral.

going forward to challenge the amount of FNB's secured claim. *In re Heritage Highgate, Inc.*, 679 F.3d at 140. If Debtor "establishes with sufficient evidence that the proof of claim overvalues [FNB]'s secured claim because the collateral is of insufficient value, the burden shifts." *Id.* "[FNB] thereafter bears 'the ultimate burden of persuasion ... to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim.'" *Id.* (quoting *In re Robertson,* 135 B.R. at 352)). The appraisal reports establish that FNB's proof of claim overvalues the collateral. The burden therefore shifts to FNB to demonstrate the value of the collateral securing its claim.

### D. Valuation Approaches

"[V]aluation is not an exact science." *In re Centennial Park, LLC,* 2011 WL 5520968, at *2 (Bankr.D.Kan.2011) (quoting *In re Sandy Ridge Dev. Corp.,* 881 F.2d 1346, 1354 (5th Cir.1989)).[10] "There is no clear[-]cut formula or benchmark for valuing a creditor's collateral, and valuation depends upon the facts and evidence presented in each particular case." *In re Owens,* 120 B.R. 487, 490 (Bankr.E.D.Ark.1990). However, appraisers and courts often look to three "generally recognized appraisal techniques available to determine the fair market value of real property." *In re Zersen*, 189 B.R. 732, 738 (Bankr. W.D. Wis. 1995). "First, there is the market or sales comparison approach, which is based upon evidence of comparable sales. Second, there is the cost or land development approach, in which actual costs of construction are reduced for depreciation." *Id.* The third technique is the "capitalization of income approach, which capitalizes the net future income that the property is capable of producing." *Id.* These approaches are also commonly used to value personal property. *See, e.g.*, *In re Thornton*, No. 15-6762-RLM-13, 2016

---

[10] *See also Consolidated Rock Prods. Co. v. Du Bois,* 312 U.S. 510, 526 (1941) (determinations of value in the bankruptcy context do not rise to the level of "mathematical certitude")

WL 3092280, at *2 (Bankr. S.D. Ind. May 23, 2016) (discussing the three approaches in the context of appraising personal property).

The appropriate valuation approach, or the weight to be given to the different approaches, to determine fair market value depends on such things as (a) the nature of the debtor's business, (b) the types of assets to be valued, (c) the availability of comparable sales and the nature and type of adjustments to comparable sale needed to arrive at a value, and (d) the extent to which the depreciated cost of replacing or reproducing the asset approximates fair market "as is" value. *See In re Motors Liquidation Co.*, 576 B.R. 325, 440 (Bankr. S.D.N.Y. 2017) (discussing the appraisers' determination of the appropriateness of different valuation approaches under the circumstances).[11]

## III. Evaluating Competing Appraisals

The bankruptcy court has broad discretion "in arriving at valuations independent of any one expert's opinion." *In re Diamond Beach VP, LP*, 551 B.R. 590, 610 (S.D. Tex. 2016). In exercising that discretion, the bankruptcy court may "decide to credit or discredit, in whole or in part, the testimony of any expert witness, and decide the case on the evidence." *Id. (*quoting *Alberts v. HCA, Inc.*, 496 B.R. 1, 18 (D.D.C.2013)). In reaching its determination of value, this Court will consider both appraisals, the testimony of the Appraisers, and the other evidence.

## IV. The Value of Debtor's Real Property, Improvements, and Equipment

### A. Differences in the Approaches Taken by the Appraisers

Both Appraisers were tasked with preparing a report setting forth their opinion of "as is, where is" market value of the tangible real and personal property pledged to FNB. Generally, an

---

[11] *See also In re Mocco*, 222 B.R. 440, 470 (Bankr. D.N.J. 1998) ("The decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts."); Stan Bernstein et. al., *Squaring Bankruptcy Valuation Practice with Daubert Demands*, 16 Am. Bankr. Inst. L. Rev. 161, 186–87 (2008) (discussing when each valuation method is appropriate).

-14-

"as is" appraisal considers the property in its condition on the date of the appraisal. In contrast, an "as if" appraisal considers the value of the property given a proposed change or improvement to the property.

An important difference between the two appraisals relates to the assumptions the Appraisers made. Because he did not access the interior of the Car Wash, Manager's Quarters, Duplexes, or Kiosk, Bumguardner made an "extraordinary assumption"[12] that "the subject property's interior, and all [furniture, fixtures and equipment] were in place and in functionable operable condition" as of the appraisal date. Exh. T, pg. 179. With respect to the Car Wash more specifically, he made the extraordinary assumption that both car wash bays were fully operable as automatic drive-through car washes. Bumguardner noted that "the use of this extraordinary assumption may have affected the . . . results" of his analysis. Exh. T, pg. 179.

Beatty's report states that he did not rely on an extraordinary assumption about the property. However, Beatty noted that, on the date of this appraisal, neither car wash bay was operable. He assumed that Debtor was consolidating equipment into the southern bay and that it "should be fully functional and the car wash open in the upcoming weeks." Exh. 33, pg. 5. In his final analysis, Beatty assumed that the Car Wash had two functioning bays, then reduced his opinion of value by the cost for new equipment to make the second bay operational.

Another important difference between the two appraisals relates to how they packaged the assets for purposes of their appraisals. Bumguardner organized his appraisal around each distinct legal tract. In applying all three approaches, he valued the Manager's Quarters and Car Wash

---

[12] An "extraordinary assumption" is "an assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions" *In re Ponce de Leon, 1403, Inc.* (Bankr. D.P.R. 2014) (quoting USPAP 2014–2015, pg. U–3)). "Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property; such as market condition or trends; or about the integrity of data used in an analysis." *Id.*

(including equipment), which are situated on the same tract, together. He did not value those assets separately. In contrast, Beatty valued the Car Wash (including equipment) separately from the Rental Units (the Duplexes and the Manager's Quarters). Further, neither appraiser included rental income from the Kiosk ($600/month) in the income approach analysis because the Kiosk was not rented until August 2020.[13]

The Court addresses the impact of these different appraisal methodologies in its discussion of each appraisal.

**B. The Sales Comparison Approach**

    1. <u>Valuing the Car Wash under the Sales Comparison Approach</u>

The Court finds that the values of the Car Wash derived by both Beatty and Bumguardner from the sales comparison approach are somewhat unreliable because of the extent to which the comparable sales relied on are dissimilar to Debtor's Car Wash. *See In re Diamond Beach VP, LP*, 551 B.R. at 609 ("Bankruptcy courts are not bound to follow an expert's choice of methodology, particularly where that choice is not supported by the evidence."). The Appraisers looked for comparable properties that were like Debtor's Car Wash, assuming that Debtor's Car Wash has two functioning bays. Because of that assumption, the Appraisers did not adjust the comparison properties to reflect that Debtor has only one functioning bay. However, as of November 19, 2020, the Car Wash has only one fully functioning car wash bay with a significant amount of new equipment and Debtor uses its other bay for detailing and other services. In addition, the evidence shows that Debtor does not intend to install automated car wash equipment in its second bay because the demand in Ruidoso for automated car washes does not justify incurring the cost of new automated car wash equipment, particularly when the new Laser Wash 360 Plus system

---

[13] In addition, neither Appraiser addressed the impact of COVID-19, if any, on their analyses or final opinions of value.

-16-

provides higher throughput capacity and can accommodate large vehicles. Thus, analyses based on comparison sales with multiple car wash bays, coupled with an assumption that Debtor has two drive-through car wash bays, makes both Appraisers' application of the sales comparison approach quite a bit less reliable than other approaches.

Bumguardner selected recent sales of six car washes for his analysis. The six car washes ranged in size from 2,094 square feet to 14,460 square feet and were from 12 and 25 years old. Sales prices ranged from $200,000 to $2,000,000. Most importantly, the price per square foot ranged from $95.51 to $185.94. Even after Bumguardner adjusted for market conditions, location, amenities and effective age, the adjusted price per square foot ranged from $98.04 to $216.94. Bumguardner's opinion of the price per square foot of the car wash is $140, which is about 44% higher than the lowest and about 25% lower than the highest adjusted comparable price. In addition, Bumguardner stated that none of the properties included an improvement akin to the Manager's Quarters but did not explain how the values of those properties were adjusted to reflect that difference.

Although Beatty examined five recent car wash sales, he concluded that those properties were too dissimilar to permit a price per square foot analysis. Instead, Beatty employed an "effective gross income multiplier" ("EGIM"). Information on gross income, however, was only available for two of the properties, and only one of those properties had two car wash bays. Moreover, as he acknowledged, the use of an EGIM essentially is a "simplistic income approach." Exh. 33, pg. 80.

2.      Valuing the Duplexes under the Sales Comparison Approach

Applying the sale comparison approach to value the Duplexes, Bumguardner examined four comparison properties. The unadjusted price per square foot of the comparison properties

-17-

ranged from $68.49 to $173.05. Bumguardner adjusted the prices per square foot of those properties to account for differences in effective age and size compared with the Duplexes, resulting in adjusted prices per square foot for the comparison properties ranging from $112.32 to $219.77. After calculating the mean and median of the adjusted prices per square foot, $155.92 and $145.79, respectively, and considering the physical attributes of the Duplexes, Bumguardner assigned a value of $150 per square foot to the Duplexes. That equates to a total rounded value of $500,000. Next, Bumguardner determined the value of the Duplexes based on the sales price per unit of the comparison properties instead of the price per square foot. The sales prices per unit ranged from $65,000 to $106,000. After adjusting the sales prices per unit for differences between the comparison properties and Duplexes, Bumguardner calculated adjusted sale prices per unit for the comparison properties ranging from $104,0000 to $131,440. Using the mean of the adjusted sale prices, Bumguardner assigned a value of $115,000 to each Duplex rental unit, or $460,000 for all four.

Beatty examined four comparison properties, three of which were the same comparison properties that Bumguardner relied upon. However, Beatty determined that the comparison properties were too dissimilar to the Duplexes to allow use of the comparable price per unit approach that Bumguardner used. Instead, Beatty used a "projected gross income multiplier" ("PGIM") rather than price per square foot analysis. He found that the two comparison properties for which data was available had PGIMs of 7.5 and 7.9 and concluded that the appropriate PGIM here is 7.75. Applying the PGIM of 7.75 to the projected income of the Rental Units results in a value of $409,200 for the Duplexes and $93,000 for the Manager's Quarters, for a total of about $500,000. However, the PGIMs for those properties were based on assumptions of vacancy loss at 5% and expenses at 20%, both of which are substantially lower than Beatty's assumptions for

-18-

the Rental Units applied in the income approach analysis, as discussed below. This difference renders Beatty's conclusion less reliable. *See* Robert F. Reilly, *How to Build A Strong Real Estate Appraisal Report*, Am. Bankr. Inst. J., September 2004, at 44, 49 (stating that the EGIM and PGIM depend on "an implied assumption is that the future performances of the comparable properties and the subject property will be similar.").

Because of the substantial dissimilarities between the Car Wash, Manager's Quarters, Duplexes, and Kiosk and the comparison properties used in each appraisal, the Court will not weigh heavily the values derived from the sales comparison approach by either appraiser in the final analysis of value.

### C. The Income Approach

The income approach is "frequently used to value income producing real estate and is based on the premise that at a given rate of return for a real estate investment, an owner would pay a certain price to obtain the benefits of the expected future income stream." *In re River Valley Fitness One Ltd. P'ship*, No. 01-12829-JMD, 2006 WL 618442, at *2 (Bankr. D.N.H. Mar. 7, 2006).[14] Within the income approach, the Appraisers applied the "direct capitalization method," which requires five steps: (1) identify the gross potential income; (2) estimate the effective gross income by deducting an appropriate credit and vacancy loss from the gross potential income; (3) estimate and subtract the stabilized operating expenses from the effective gross income to derive the net operating income ("NOI"); (4) identify an overall capitalization rate; and (5) capitalize the NOI.

Although he began with stabilized annual income for the Car Wash and Rental Units (including the Manager's Quarters), Beatty did not opine on the separate value of the Car Wash,

---

[14] *See* Stan Bernstein et. al., *Squaring Bankruptcy Valuation Practice with Daubert Demands*, 16 Am. Bankr. Inst. L. Rev. 161, 186–87 (2008) ("The [income] approach is appropriate in many situations for determining the debtor's going concern value, when the value of any asset, including a company, can be reasonably estimated to be the present discounted value of the future cash flows that are generated by that asset.").

-19-

Manager's Quarters, and Duplexes. Instead, he applied the same expense ratio and capitalization rate to the Car Wash and Rental Units to determine that the aggregate value of these assets under the income approach is $900,000. In contrast, Bumguardner found that the value of the Car Wash and Manager's Quarters together is $485,000 and the value of the Duplexes is $470,000, for a total of $955,000.

The two appraisers found slightly different stabilized gross income for the Car Wash (Beatty--$125,000; Bumguardner--$130,000) and both assumed there are two fully functional automatic car wash bays. Beatty estimated stabilized future income of $125,000 based on income from 2016-2018, with emphasis on 2017 and 2018. He stated that he did not rely on 2019 data because only one car wash bay was operating that year or on Debtor's projections of income because they were based on only one fully functional bay. Bumguardner estimated stabilized future annual income from the Car Wash, assuming two functional automated car wash bays, of $130,000 based on five years of historical annual income (2014-2018). Neither appraiser realized that Debtor had only one functioning car wash bay in most of 2017 and all of 2018.

As to the Duplexes, Bumguardner determined the stabilized annual income from the Duplexes is $55,752 compared with $52,800 found by Beatty. The difference is attributable in part to the fact that Beatty used a vacancy loss rate of 15%, whereas Bumguardner used a rate of 5%.

It is difficult to compare the Appraisers' calculations of NOI for the Car Wash only. Bumguardner calculated an expense ratio of 66% for the Car Wash and Manager's Quarters. In calculating the 66% expense ratio, Bumguardner averaged actual expenses for 2016 through 2018. He did not adjust for substantially lower payroll expenses in 2017 when Mr. Pacheco managed the Car Wash and other property for no salary.

-20-

Bumguardner calculated an operating expense ratio of 38% for the Duplexes. Bumguardner stated that an expense ratio for comparable multi-family properties lies between 39.74% and 52.92% of effective gross income. Analysis of rental property appraisals in his files revealed an expense ratio of 28% to 47% on a stabilized basis. Bumguardner also considered historical and projected expenses for the Duplexes and concluded that an expense ratio of 38%, which is at the lower end of the industry range, "is considered reasonable due to the size and condition of the" Duplexes. Exh. T, pg. 112. But the figures in Bumguardner's report for Debtor's historical and projected expenses for the Duplexes are not supported by the profit and loss statements in the appendix to his report or any other evidence. There is no evidence that the expenses for the Duplexes will decline as Bumguardner assumed in his analysis. In fact, Debtor's income and expense projections included in Beatty's report suggest that total expenses for all assets will remain stable for the next three years.

Beatty calculated a blended expense ratio of 50% for the Car Wash, Manager's Quarters, Duplexes, and Kiosk together—he did not break out the expense ratio for the Car Wash separately from the Rental Units. In his analysis, he noted that Debtor's expenses were 59% in 2016, 52% in 2017 (after adjustment for payroll expense), and 57% in 2018, and that Debtor projected expenses at 54% for the Car Wash, Manager's Quarters, Duplexes and Kiosk in the next three years. Beatty also considered similar properties to the Duplexes and concluded that the expense ratios ranged from 43% to 57%. Because the expense rate for 2016 and 2017 is not appreciably different from the rate in 2018 when the Duplexes were first rented, and Debtor's projected expenses, the Court finds that Beatty's use of a blended rate is reasonable. Given the history of Debtor's expenses and Debtor's projections, however, the Court finds that an expense rate of 50% is not supported by the evidence.

Beatty applied the same capitalization rate (10%) to the Duplexes as he did to the Car Wash based on comparison multi-family rental properties with capitalization rates of 10.1% and 9.6%. After finding that the Duplexes "are modern units and the newest multifamily rentals in the market," he stated there was no "atypical investment risk associated with" the Car Wash or Rental Units, which justified the 10% capitalization rate. In testimony, Beatty stated that the capitalization rate can differ between types of properties.

Bumguardner determined that, unlike the Car Wash, the Duplexes carried a capitalization rate of 7%. He found comparison sales with capitalization rates of 10.46% and 10.00% and data from two different national investor surveys showed an average capitalization rate for apartments of 7.94% and 5.14%. However, because the Duplexes are less "management intensive" than the Car Wash and there is a high demand for properties like the Duplexes, he determined that a lower investment risk for the Duplexes justified use of lower capitalization rate for the Duplexes than for the Car Wash. The Court agrees that the risk associated with the Duplexes, which Beatty agreed are much newer and in better condition than the Car Wash, justifies a lower capitalization rate than that used for the Car Wash. *See In re TIAT Corp.*, No. 16-10764, 2017 WL 161675, at *10 (Bankr. D. Kan. Jan. 13, 2017) ("As risk rises, so does the capitalization rate."); *In re River Valley Fitness One Ltd. P'ship*, 2006 WL 618442, at *2 ("The use of the [i]ncome [a]pproach is not straight forward . . . because the determination of NOI can be problematic. In addition, determining an appropriate [capitalization rate] is difficult because small changes in the determination of the [capitalization rate] can result in significant differences in [m]arket [v]alue.").

In short, the Court finds Bumguardner more credible as to the appropriate capitalization rate for the Duplexes, and that, while Beatty's use of a blended rate for all Debtor's assets is reasonable, an expense rate of 50% is not supported by Debtor's historical and projected income

and expense data. Based on that data, the Court finds that a blended expense rate of 56% is justified. When the Court applies an expense rate of 56% to all assets and capitalization rate of 7% to the appraisers' figures for the Duplexes, Bumgardner's final income approach overall value remains roughly the same at $955,000, whereas Beatty's overall value drops from $900,000 to $885,000.

The difference in the Appraisers' methodologies makes a comparison of their analyses difficult. More important is the fact that both Appraisers purportedly based their analysis on income during years in which Debtor sometimes had one and sometimes had two functioning car wash bays. Beatty based the stabilized annual income for the Car Wash on 2016 through 2019, with emphasis on 2017 and 2018 and Bumgardner used 2014 through 2018. But the equipment in the northern bay stopped working in early 2017 (the date in 2017 on which the equipment stopped working is not clear from the evidence). Thereafter, Ruidoso Laserwash offered drive-through car washes in the southern bay and hand-washing and other services in the northern bay. Debtor's income in 2018 was approximately $3,000 lower than its income in 2017 and $10,000 lower than in 2016, and, at that time, Debtor did not break out its income from the drive-through car wash from income from car detailing or other services. Thus, only limited evidence was presented addressing the impact on profitability of having one or two drive-through car wash bays and neither appraisal report addressed the impact on the income approach of one versus two car wash bays or the new Laser Wash 360.

Beatty testified that, if the income from 2017 and 2018 was earned from a single car wash bay, his opinion of the income approach value would likely change, and Bumgardner stated that if the extraordinary assumption on which he based his appraisal is incorrect, he would have to do

a new appraisal to analyze the impact of that change. He declined to assess the effect of the fact that only one car wash bay was operational in most of 2017 and 2018 on his final opinion of value.

Since the Appraisers themselves declined to adjust their values derived from the income approach analysis, the Court is likewise hesitant to predict how the Appraisers' income analyses would be different had the Appraisers known that only one drive-through bay was operating in most of 2017 and all of 2018. Nevertheless, values derived from the income approach and the Court's analysis of the calculations therein are instructive and the Court will give them moderate to significant weight in its final assessment of value.

### D. The Cost Approach

"The cost approach values a property based on the sum of current depreciated replacement or reproduction cost of the property, together with land value and an appropriate incentive or profit figure, where applicable." *In re Museum of Am. Jewish History*, 2020 WL 7786925, at *3. "Bankruptcy and other courts often use the cost approach to value assets as part of a going concern, particularly where there is a lack of reliable comparable market sales." *In re Motors Liquidation Co.*, 576 B.R. 325, 424 (Bankr. S.D.N.Y. 2017) (citing cases)). Under the cost approach, the appraiser estimates "1) the value of the site as vacant and available to be developed to its highest and best use, 2) the cost new (reproduction or replacement) of the improvements, and 3) the depreciation of the improvements." Exh. 33, pg. 37. Then, "[t]he estimated market value of the land is added to the depreciated cost of the improvements to result in an indication of market value for the property." *Id.* Using this approach, Beatty and Bumguardner determined that the value of the Car Wash, Manager's Quarters, Duplexes and Kiosk is $1,190,000 and $1,000,000, respectively, assuming two functioning automated car wash bays.

The Appraisers first estimated the current market value of the subject site, as if vacant, based on similar recent land sales. Both determined that the value of the land was $5.50 per square

-24-

foot, or $150,000 for Tract 1 (Car Wash and Manager's Quarters) and $110,000 for Tract 2 (Duplexes and Kiosk).

Both Appraisers next determined the "replacement cost new" ("RCN") of the improvements on the site. The RCN is "the estimated cost to construct, at current prices, as of the effective appraisal date, a substitute for the building being appraised using modern materials and current standards, design and layout." Exh. T, pg. 65 (quoting THE APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE, 385, 13th ed. 2008). The Appraisers relied on the Marshall & Swift Valuation Service to determine the RCN of the Car Wash building (including the canopy), the Manager's Quarters, the car wash equipment, the Duplexes, the Kiosk, and the site improvements such as asphalt, retaining walls, landscaping, water wells, and sidewalks.

The Appraisers differed significantly in the initial price per square foot for some of the improvements, despite citing the same sections and pages of the Marshall & Swift Valuation Service. In addition, Bumguardner added 8% for "soft costs," which include professional fees, taxes, architect's fees, and other indirect costs and 10% for "developer's profit." It is not clear whether Beatty included any amounts for soft costs but he did include developer's profit at 15%. Despite these differences, Beatty derived a total RCN of $1,606,094 and Bumguardner a total RCN of $1,585,924, a difference of only approximately $21,000.

Where the Appraisers' application of the cost approach diverges is in the amount of depreciation of the improvements. Although the Appraisers relied on the Marshall & Swift Valuation Service to determine the appropriate useful life of some of the assets, they differed in their assessment of the effective age of those assets. Thus, while the Appraisers' reached a similar total RCN, Bumguardner found that the contributory value of the Car Wash, Manager's Quarters,

Duplexes, and Kiosk, together with the site improvements, was approximately $153,000 lower than Beatty's total contributory value.

The largest disparity between the depreciation rates relates to the site improvements on the Car Wash property (Tract 1) such as paving, sidewalks, retaining walls, and wells. Bumguardner stated that such improvements "have a shorter economic life than the main building improvements" and that the depreciation rate to be used to value those improvements is 80% based on an effective age of 20 years and useful life of 25 years. In contrast, Beatty does not explain how he arrived at a depreciation rate of 50% for these improvements.

The Appraisers also made different findings as to the Car Wash and Manager's Quarters. Bumguardner found that the Car Wash, which was built in 1999, had been "adequately maintained and is in average condition," and concluded that the effective age of the car wash building is 20 years and its useful life is 40 years, resulting in a depreciation rate of 50%. Beatty, however, stated that the useful life of the Car Wash is 30 years. Despite finding that Car Wash has "fallen into a state of disrepair" and that "[i]tems of deferred maintenance in and around the car wash building include[] weathered paint around the exterior, rusted and corroded bay doors, rusted steel roof decking, damaged wall panels in the [b]ay, drywall repair and paint touch-up," Beatty found its effective age was only 12 years. Exh. 33, pg. 27. His calculation resulted in a depreciation rate of 40%. Beatty's final contributory value of the Car Wash was approximately $65,000 over Bumguardner's value.

In contrast to the effective age for the Car Wash, Beatty estimated that the effective age of the Manager's Quarters is 30 years[15] despite his finding that the Manager's Quarters is "well

---

[15] Bumguardner found that the Manager's Quarters were built in 1999, the same year as the car wash building, and that the useful life was 20 years, the effective age was 50 years, and the depreciation rate was 40%. Beatty stated that the year the Manager's Quarters were built is unknown. The Court finds that the Manager's Quarters were built in 1999.

-26-

maintained and in average condition" and that "[t]he stucco, windows and carpet were all replaced in recent years. No items of deferred maintenance were noted during the property inspection." Exh. 33, pg. 28. Moreover, in a 2016 appraisal of Debtor's property, Beatty stated that the effective ages of both the Car Wash and Manager's Quarters was 10 years, based in part on his finding that they had been "well maintained." Exh. S, pg. 50. Beatty did not explain the change in effective age of the Manager's Quarters from 10 years in 2016 to 30 years in 2020 considering these findings.

Notably, the Appraisers reached nearly the same contributory value for the car wash equipment (Beatty - $106,000; Bumguardner - $101,000). Beatty used a depreciation rate of 75% for car wash equipment. He did not explain the source of this rate in the report, but Beatty testified that he did not rely on the Marshall & Swift Valuation Service or the effective/useful life of the equipment and instead gave his best estimate. Mr. Pacheco, however, testified that the useful life of a car wash system is 15 years, and Bumguardner found that car wash equipment generally has a useful life of 10-15 years. Although the original equipment was installed in 1999, because some equipment was upgraded in 2014 or 2015, Bumguardner estimated an effective age of 8 years and concluded that the applicable depreciation rate is 80%. Neither appraiser examined the equipment carefully or assessed its functionality. Based on Mr. Pacheco's testimony that the automated car wash system in the northern bay stopped operating in 2017, that the automated car wash system in the southern bay stopped operating in 2020, and that the equipment Debtor did not reuse for its Laser Wash 360 Plus system had little or no sale or salvage value because it was not functioning, the Court finds that a substantial portion of the equipment pledged to FNB is fully depreciated.

Using the cost approach, the Appraisers reached similar values for the Duplexes. If the duplex building and the site improvements to Tract 2 are considered together, the RCN for those assets in the two appraisals differs by only $8,300. Moreover, the Appraisers applied nearly the

-27-

same depreciation rate (6% and 5%) to the Duplexes, which is consistent with the age of the building. Using Beatty's RCN and depreciation rates, the contributory value of the land and improvements on Tract 2, the site of the Duplexes, is $532,000. Using Bumguardner's figures, the contributory value of the land and improvements on Tract 2 is $515,000, a difference of only $16,000 from Beatty's value.

   E. **Summary of the Appraisers' Conclusions of Value of the Car Wash, Manager's Quarters, Duplexes, and Kiosk**

The following chart summarizes the Appraisers' final opinions regarding the value of the Car Wash, Manager's Quarters, Duplexes, and Kiosk.

| | Sales Comparison Approach | Income Approach | Cost Approach | Final Opinion of Value (Unadjusted)[16] |
|---|---|---|---|---|
| **Beatty** | | | | |
| Car Wash w/ Manager's Quarters | $565,000 | Not stated separately | Not stated separately | Not stated separately |
| Duplexes | $500,000 | Not stated separately | Not stated separately[17] | Not stated separately |
| **Total** | **$1,065,000** | **$900,000** | **$1,190,000** | **$980,000** |
| | | | | |
| **Bumguardner** | | | | |
| Car Wash w/ Manager's Quarters | $480,000 | $485,000 | $482,000 | $485,000 |
| Duplexes | $460,000-$500,000 | $470,000 | $515,000 | $500,000 |
| **Total** | **$940,000-$980,000** | **$955,000** | **$1,000,000** | **$985,000** |

---

[16] This table reflects the Appraiser' opinion of value based on a car wash with two functioning drive-through car wash bays. The next section addresses whether and to what extent the final value of the Car Wash should be adjusted to account for the fact that only one bay is currently functioning as a drive-through car wash.

[17] Based on the figures in Beatty's cost approach calculations, the value of the Car Wash and Manager's Quarters is approximately $656,000 and the Duplexes $532,000.

-28-

### F. Adjustments to the Car Wash Value Determined by the Appraisers

#### 1. Adjustments to Income Approach Valuations

Beatty and Bumguardner assumed that the Car Wash had two fully functioning bays. In his appraisal, Beatty acknowledged that, in fact, neither bay was operating on the date of his appraisal but stated that he understood that the southern bay would be operable shortly after completion of the appraisal. He also stated that "[t]he equipment for the [northern] bay will have to be completely replaced to achieve the income potential and projections used in this analysis. Thus, to reflect the As-Is market value of the property, the cost to replace the equipment in the [northern] bay must be deducted from the concluded value" of $980,000. Exh. 33, pg. 80. Beatty therefore deducted $200,000 for the cost of new equipment for the second bay based on a quote by Sun Country. His final appraisal value for all the assets he appraised was $780,000.

FNB argues that this deduction is incorrect because the data relied on for the income approach in fact reflected income when Debtor was operating only one fully automated car wash bay and using the other bay for detailing and other services. As discussed above, Beatty stated that his income approach analysis would likely be different if the historical data on which he relied resulted from one drive-through bay rather than two. But he did not opine on how the value would change. Moreover, his reduction for the cost of a new Laser Wash 360 Plus system for the northern bay depends on his finding that the highest and best use of the property is as a car wash with two drive-through bays. The term "highest and best use" is defined as "[t]he reasonably probable and legal use of vacant land or an improved property, that is physically possible, appropriately supported, financially feasible, and that results in the highest value." *In re Old Colony, LLC*, 476 B.R. 1, 12 (Bankr. D. Mass. 2012), *as amended* (July 16, 2012) (quoting WF Appraisal 65 (quoting

THE APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE, 306 (12th ed. 2001)).[18] The evidence

shows, however, that two fully automated car wash bays are not required to achieve the highest

and best use of the Car Wash. In one of the years (2018) Beatty used in his analysis of income,

only one drive-through bay was operating and, in another year (2017), only one bay was operating

for most of the year. Bumguardner testified that a prudent manager of the Car Wash would not

invest in a second drive-through car wash system if it would not increase income. More accurately,

a prudent operator would not invest in a second drive-through car wash system if it would not

sufficiently increase earnings to justify the cost of the new car wash system. In fact, consistent

with the highest and best use of the Car Wash, Debtor does not intend to operate the northern bay

as a drive-through car wash and plans instead to reserve that bay for detailing and other services.

The income analysis "is intended to model the typical analysis undertaken by an investor."

Exh. 33, pg. 80. Here, if it were clear that the income data from which Beatty derived the value of

$980,000 was based on two functional drive-through bays for a car wash operating at its highest

and best use, the cost to create a second drive-through car wash bay would have to be deducted

from that value because a prudent investor would factor that cost into the purchase price. *See In re*

*Old Colony, LLC*, 476 B.R. at 16 (criticizing an appraisal that did "not appropriately take into

account [in the income approach] the cost of capital expenditures a potential purchaser would

anticipate if buying the [p]roperty and would factor into the purchase price"). However, because

the evidence establishes that a prudent investor would not purchase and install a second automated

car wash system in the Car Wash, a deduction for the cost of a new car wash system should not be

made. *See In re River Valley Fitness One Ltd. P'ship*, 2006 WL 618442, at *15 (stating that "it is

---

[18] *See* Exh. 33, pg. 35 (quoting THE APPRAISAL INSTITUTE, THE DICTIONARY OF REAL ESTATE APPRAISAL, 93, (5th ed. 2010)).

not likely a willing buyer would pay reproduction-cost prices for special improvements for the [h]ighest and [b]est [u]se if those improvements could not generate an appropriate return").

Nevertheless, that conclusion does not mean no adjustment should be made as a result of Beatty's incorrect assumption that there would be two operating drive through car wash bays. Of the five-year period relied on by Bumguardner, Car Wash income was highest in 2014 and 2016, which account for two of the three years in which there were two functioning automatic car wash bays for the entire year. That indicates that a second automatic car wash bay contributed some value, but not enough to justify the cost of buying a new second system.

### 2. Adjustments to Cost Approach Valuations

Using the cost approach analysis, Beatty found the contributory value of two bays-worth of car wash equipment is approximately $106,000 ($426,421 RCN less $319,816 of depreciation); Bumguardner found it is $101,000 ($505,000 RCN less $404,000 of depreciation). Beatty's[19] assessment of the contributory value of the equipment must be adjusted because a substantial portion of that equipment had already reached the end of its useful life and has little or no contributory value to FNB's collateral. Mr. Pacheco testified that a railing system, wash station, and pump station from the Laser Wash 4000 system can be and are used with the new Laser Wash 360 Plus system in the southern bay. In addition, the water storage tanks, water treatment/reverse osmosis system, and other equipment that had been used to operate both car wash bays is being used to operate the Laser Wash 360 Plus system in the southern bay and to facilitate some services in the northern bay. Thus, the equipment now in the southern bay or used to operate the southern bay consists of 1) some of the equipment that was in the northern bay on the Petition Date and that subsequently was moved to the southern bay; 2) equipment that was in the southern bay on the

---

[19] The Court relies on Beatty's assessment of the contributory value of the equipment consistent with its ruling admitting Bumguardner's appraisal in evidence.

Petition Date; 3) equipment that was in the car wash building on the Petition Date that was used to operate both bays when both bays were functioning as drive-through bays; and 4) the After-Acquired Equipment. In the northern bay, although it no longer functions as a drive-through car wash, some equipment acquired pre-petition is usable for detailing and other services. FNB has a lien on Debtor's equipment acquired pre-petition. Except to the extent granted by the Court as adequate protection for use of cash collateral, FNB does not have a lien on the After-Acquired Equipment installed in the now-operable southern bay.

The evidence before the Court does not permit the Court to discern the exact amount of the contributory value of all the equipment acquired pre-petition against which FNB has a lien that Debtor is still using. In Beatty's cost approach analysis, he determined that the contributory depreciated value of the equipment used to operate both bays is approximately $17,000. The $17,000 figure does not include the other equipment acquired pre-petition that is being used in the southern bay with the new Laser Wash 360 Plus system or in the northern bay for detailing and other services, nor does it reflect the sale or salvage value, if any, of the non-working equipment. Mr. Pacheco testified credibly that an "undercarriage and side blaster" remain in the northern bay and are used for detailing vehicles and Debtor presented evidence that the cost of a new undercarriage and side blaster with "Gatling Gun" is $9,206. At 75% depreciation, the deprecation rate Beatty estimated, the contributory cost of such equipment is $2,302. The Court cannot determine the value of any other equipment in the northern bay or the salvage value of any other non-functional equipment because no evidence was presented on the value of those items. *Cf. In re Old Colony, LLC*, 476 B.R. at 18 (declining to deduct an amount for personal property in a hotel from the value of the hotel where no evidence had been presented on its value).

-32-

The Court therefore finds that the contributory value of the equipment to the value of the equipment pledged to FNB is $20,000 instead of $106,000 and $101,000 as found by Beatty and Bumguardner, respectively.

### G. The Value of the Real Property, Improvements, and Equipment Subject to FNB's Lien

The Court finds, under the circumstances, the cost and income approaches are the most reliable approaches the Appraisers used to value FNB's collateral. As to the cost approach, the Court finds Bumguardner's appraisal and testimony more reliable because the depreciation figures he used for the Car Wash, site improvements, and Manager's Quarters were more credible than Beatty's. However, Bumguardner's cost approach value ($1,000,000) should be adjusted downward to reflect a contributory value of equipment in the amount of $20,000 instead of $101,000.

As to the income approach, Beatty's use of a blended expense rate for the income approach analysis is more consistent with the evidence before the Court than Bumguardner's different expense rates for the Car Wash and Duplexes, but the Court finds that the evidence supports an expense rate of 56%, rather than Beatty's 50%. Moreover, a capitalization rate of 7% is justified by the amount of risk to an investor posed by the Duplexes. When the Court applies a 56% expense rate for all assets and a 7% capitalization rate for the Duplexes to Beatty's figures, the result is approximately $885,000, $15,000 lower than Beatty's final income approach value, whereas Bumguardner's final income approach value remains substantially unchanged.

Considering (1) Beatty's $900,000 (reduced to $885,000 after adjusting for the expense and capitalization rate) and Bumguardner's $955,000 opinions of value under the income approach, both of which should be reduced to account for the fact that the opinions were premised on two functional drive through car wash bays; (2) Bumguardner's $1,000,000 opinion of value

under the cost approach reduced to $920,000 to reflect the actual contributory value of the equipment; (3) Beatty's $780,000 and Bumguardner's $985,000 final opinions of value assuming two functioning car wash bays; (4) the unreliability of the sales comparison approach because of the dissimilarities to the subject properties; (5) the analyses performed by the Appraisers; (6) the other evidence; and (7) the burden of proof, the Court finds and concludes that the value of the property encumbered by FNB's lien, excluding rents and other cash collateral as well as After-Acquired Equipment, is $900,000.

### H. The After-Acquired Fixtures Are Not Subject to FNB's Liens Except to the Extent Provided in Cash Collateral Orders

FNB argues that the After-Acquired Equipment installed in the southern bay is a fixture under New Mexico law[20] and, therefore, is subject to FNB's secured interest in the Car Wash real property. "Whether any particular article has become a fixture . . . cannot be determined in a vacuum; the court must have the facts before it." *Matter of Miller*, 63 B.R. 512, 514 (Bankr. N.D. Ind. 1986). Under New Mexico law, whether an asset is a "fixture" depends on whether there has been "real or constructive annexation to the real estate, appropriation or adaptation to the use or purpose of that part of the realty with which it was connected," as well as "the intention of the party making the annexation to make it permanent." *Sw. Pub. Serv. Co. v. Chaves Cty.*, 1973-NMSC-064, ¶ 14, 512 P.2d 73; *see* NMSA 1978, § 55-9-102(41) (defining "fixtures" as "goods that have become so related to particular real property that an interest in them arises under real property law"). The After-Acquired Equipment is comprised of several different components. While the evidence suggests that some components of the After-Acquired Equipment may be "annexed" to the real property, FNB has not demonstrated that any equipment or components constitute fixtures under New Mexico law or the value of any such fixtures.

---

[20] *See Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law.").

-34-

Moreover, to the extent the After-Acquired Equipment is a fixture, § 552(a) operates to cut off any lien against property acquired by the estate or by the debtor after commencement of the case "resulting from *any security agreement* entered into by the debtor before the commencement of the case." (Emphasis added.). Section 552(a) cuts off "all security interests as defined in section [101] of the Bankruptcy Code, not only . . . security interests governed by the Uniform Commercial Code." 5 Collier on Bankruptcy P 552.01 (16th 2020) (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 91 (1978)).[21] As defined in the Bankruptcy Code, a "security agreement" is an "agreement that creates or provides for a security interest," and a "security interest" is a "lien created by an agreement." §§ 101(50), (51). A mortgage falls within these definitions. *In re Christo*, No. 12-30083, 2012 WL 3839238, at *2 (Bankr. N.D. Ohio Sept. 4, 2012) (unreported) (stating that "a mortgage is deemed to be a 'security interest' which the Bankruptcy Code defines as a 'lien created by an agreement.'").[22] FNB's interest in fixtures under its mortgage is therefore cut off unless the exception provided in § 552(b)(1) applies.

Section 552(b)(1) provides that a pre-petition security interest in "proceeds, products, offspring, or profits of . . . . property [acquired pre-petition], . . . extends to such proceeds, products, offspring, or profits acquired [post-petition] to the extent provided by such security agreement and by applicable nonbankruptcy law." FNB bears the burden of showing under § 552(a) that "its pre-

---

[21] *See In re Hastie*, 2 F.3d 1042, 1044 (10th Cir. 1993) ("Property acquired after the commencement of a bankruptcy proceeding is not subject to the lien of any security agreement entered prior to the bankruptcy petition . . . except that a security agreement covering proceeds of property acquired before commencement covers proceeds acquired after commencement.").

[22] *See also In re Railing*, No. 10-37540, 2011 WL 3321169, at *5 (Bankr. N.D. Ohio Aug. 2, 2011) (unreported) (stating that a mortgage is a consensual lien within the meaning of § 101(51)); *In re Prevo*, 393 B.R. 464, 468 (Bankr. S.D. Tex. 2008) (unreported) (stating that "[a] 'security interest' is a lien created by a voluntary, consensual agreement between debtor and creditor, such as a mortgage"); *cf. In re Uhrich*, 355 B.R. 783, 787 (Bankr. D. Neb. 2006) (stating that a mortgage is a consensual lien for purposes of § 522(f)); 2 Bankruptcy Desk Guide § 15:24 ("The protection that is provided by . . . § 552(b) of prepetition floating liens with respect to postpetition property is afforded not only to UCC security interests, but to any type of security interest that is created by a prepetition agreement, such as a mortgage on real property, because . . . § 101(51) defines the term 'security interest' more broadly than does the UCC.").

-35-

petition lien retained its vitality as a post[-]petition lien on property acquired by a debtor after the filing of bankruptcy" by "trac[ing the purchase of the After-Acquired Equipment] to . . . . pre-petition [c]ollateral or proceeds thereof." *In re Energy Future Holdings Corp.*, 585 B.R. 341, 356 (D. Del. 2018), *aff'd,* 773 F. App'x 89 (3d Cir. 2019) (quoting *In re Sherwood Ford, Inc.*, 125 B.R. 957, 962 (Bankr. D. Md. 1991). "Section 552(b) is intended to cover after-acquired property that is directly attributable to prepetition collateral, without addition of [other] estate resources." 5 Collier on Bankruptcy P 552.02 (16th 2020).

FNB does not argue that the After-Acquired Equipment constitutes "proceeds, products, offspring, or profits" of Debtor's property acquired pre-petition.[23] The Court agrees. The After-Acquired Equipment is not a "proceed" of any assets subject to FNB's lien and is not otherwise attributable to the Debtor's prepetition assets. In fact, Debtor did not pay for the After-Acquired Equipment at all: The equipment was not acquired with cash collateral or through the "sale, lease, license, exchange or other disposition" of Debtor's assets. § 55-9-102(64). Hence, the After-Acquired Equipment does not fall within the scope of § 552(b)(1). *See In re Ledis*, 259 B.R. 472, 479 (Bankr. D. Mass. 2001) (concluding that a creditor's pre-petition security interest in the debtor's equipment did not extend to equipment acquired post-petition because the creditor had not shown that the post-petition equipment was acquired by "selling, exchanging, or otherwise disposing of other collateral" under the Massachusetts UCC).

Thus, FNB's lien against Debtor's real property and equipment does not extend to the After-Acquired Equipment except to the extent the Court granted FNB a lien against the After-Acquired Equipment.

---

[23] In relevant part, the New Mexico UCC defines "proceeds" as "whatever is acquired upon the sale, lease, license, exchange or other disposition of collateral[] and . . . whatever is collected on, or distributed on account of, collateral . . . ." § 55-9-102(64). The NM UCC does not define "products," "profits" or "offspring."

## V.     The Effect of the Prior Tax Lien

Because FNB is under secured, if the Lincoln County Treasurer has a valid lien that has a higher priority than FNB's liens, the value of FNB's interest in Debtor's interest in FNB's collateral must be reduced by the amount of that prior lien. In the Amended Plan, Debtor stated the value of the Lincoln County Treasurer's claim is $18,374.90 and that Lincoln County's lien is superior to FNB's claim. *See* NMSA 1978, § 7-38-48 (stating that "[t]he lien created by this section is a first lien and paramount to any other interest in the property, perfected or unperfected."). "[A] lien under Section 7-38-48 is not dependent upon a filing of notice of lien for its creation and effect against purchasers." *Cano v. Lovato*, 1986-NMCA-043, ¶ 34, 734 P.2d 762.

At the final hearing on the Valuation Motion, FNB's representative acknowledged that Lincoln County had a lien on Debtor's real property. If the parties do not agree on the amount of the lien, the Court will take evidence at the confirmation hearing regarding the amount of Lincoln County's first priority tax lien.

## CONCLUSION

The Court finds and concludes that the value of FNB's interest in the Car Wash, Rental Units, and Kiosk is $900,000 minus the amount of Lincoln County's first priority tax lien. If the parties do not agree on the amount of Lincoln County's lien, the Court will hear evidence on that amount at the hearing on plan confirmation. The Court will enter a separate order consistent with this memorandum opinion.

Robert H. Jacobvitz
United States Bankruptcy Judge

Date Entered on Docket: January 29, 2021

-37-

Case 19-10295-j11     Doc 237     Filed 01/29/21     Entered 01/29/21 17:19:15 Page 37 of 38

## V.     The Effect of the Prior Tax Lien

Because FNB is under secured, if the Lincoln County Treasurer has a valid lien that has a higher priority than FNB's liens, the value of FNB's interest in Debtor's interest in FNB's collateral must be reduced by the amount of that prior lien. In the Amended Plan, Debtor stated the value of the Lincoln County Treasurer's claim is $18,374.90 and that Lincoln County's lien is superior to FNB's claim. *See* NMSA 1978, § 7-38-48 (stating that "[t]he lien created by this section is a first lien and paramount to any other interest in the property, perfected or unperfected."). "[A] lien under Section 7-38-48 is not dependent upon a filing of notice of lien for its creation and effect against purchasers." *Cano v. Lovato*, 1986-NMCA-043, ¶ 34, 734 P.2d 762.

At the final hearing on the Valuation Motion, FNB's representative acknowledged that Lincoln County had a lien on Debtor's real property. If the parties do not agree on the amount of the lien, the Court will take evidence at the confirmation hearing regarding the amount of Lincoln County's first priority tax lien.

## CONCLUSION

The Court finds and concludes that the value of FNB's interest in the Car Wash, Rental Units, and Kiosk is $900,000 minus the amount of Lincoln County's first priority tax lien. If the parties do not agree on the amount of Lincoln County's lien, the Court will hear evidence on that amount at the hearing on plan confirmation. The Court will enter a separate order consistent with this memorandum opinion.

Robert H. Jacobvitz
United States Bankruptcy Judge

Date Entered on Docket: January 29, 2021

Copy To:

William F. Davis
Attorney for Debtor
William F. Davis & Assoc. PC
6739 Academy Rd. NE
Albuquerque, NM 87109

Rebekah A. Scott Courvoisier
Attorney for FNB
1109 Indiana Avenue
Alamogordo, NM 88310

Daniel J. Behles
Subchapter V Trustee
1122 Central SW, Ste. 1
Albuquerque, NM 87102